Yeah. I think so. Let's see. Okay. Okay. Okay. Okay. Okay. Okay.  Okay. Okay. Okay.  Yeah. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay.   Please be seated, ladies and gentlemen. For those of you awaiting argument, I can tell you that after the second argument of today, the court will be taking a brief recess and then we'll continue with the rest of the cases. Our first case for today is United States XREL CIMZZNHCA against UCB Incorporated. We'll hear first from Ms. Patterson for the government. May it please the court, Melissa Patterson for the United States. There are both jurisdictional and merits issues implicated in the government's appeal from the district court's refusal to dismiss this key town matching claims act. And I think central to both the jurisdictional and the merits issue is the relator's mischaracterization of the United States' interest in this case. The United States here is not akin to a private party seeking to avoid litigation costs, nor is the United States akin to a defendant who just wants to wrap up the allegations brought against it more quickly. The United States here is the named plaintiff in this suit, which is an action to enforce federal law, to enforce the anti-fraud provisions of the False Claims Act based on the United States' own asserted injuries or injuries that the relators are asserting the United States suffered in an attempt to enforce federal law in a way that the United States has determined is contrary to the public interest. And in that- Ms. Patterson? Yes. Ms. Patterson, good morning. Good morning, Judge. Are there any limits to the government's right to dismiss under the unfettered discretion standard? For instance, what if the president tweets that he's going to order the Justice Department to move to dismiss a key town action because the defendants are great campaign contributors? May a court deny that motion? We need to know, I think, the outer contours of what you are suggesting. The D.C. Circuit, which, of course, announced a largely unfettered right to dismiss, did leave open the possibility. It did not opine on what might occur or what the court's role might be if there were some extraordinary circumstances such as fraud on the court. Now, I don't know if the hypothetical that you've outlined would fall within what the D.C. Circuit thought was the type of extraordinary circumstance that might depart from the usual rule that you don't look behind the government's decisions not to enforce, not to prosecute. And I actually disagree that this court needs to sort of explore the outer limits because what the district court here did bears no resemblance to any court's standard of review for a United States motion to dismiss. Of course, there's the competing standards set out by the Ninth Circuit in the Sequoia Orange case. That standard is very deferential. In most cases, the United States motion is going to satisfy either the D.C. Circuit's SWIFT standard or the Ninth Circuit's Sequoia Orange standard. And that's why, for decades, this circuit split has – or almost two decades – this circuit split has persisted. Well, has any appellate court ever rejected such a dismissal? There have only been two dismissals. Circuit court? No court has ever encountered the question. So the circuit split's never had any bite? I think that's right, Your Honor. The very first district court to ever reject the United States motion to dismiss, to find that it had not satisfied the rational relation test the Ninth Circuit used, happened last year, just like this decision. That decision is currently on appeal to the Ninth Circuit, which heard argument a few months ago. And so these are the first two cases to really be faced with a district court's misapplication of the Sequoia Orange standard. And we do think it was a misapplication. The Ninth Circuit in Sequoia – Could we talk first about jurisdiction? Of course. As I understand it, the government is asking us here to recognize a brand-new category of collateral orders that would be immediately appealable. Correct? Yes. Given the unprecedented nature of the decision, this would be the first. And the Supreme Court has repeatedly cautioned appellate courts against creating new such categories. And there are even, for example, very compelling cases such as the breach of the attorney-client privilege that are not permitted. What is so extraordinary about this kind of case that we should create such a new exception? Or – I have another thought, but I'll explore that after you answer that question. We think the Supreme Court has already indicated that there is a collateral order appeal right when the United States statutory rights as a non-party, which was what we're asserting here. That's in the Eisenstein case. That case was decided the same year as the Mohawk decision Your Honor just referred to, the attorney-client privilege decision. Right, but the problem wasn't really presented in the Eisenstein case, was it? The direct question was not, but we pushed back a little bit on the sort of relegation of the Supreme Court's observations about the collateral order availability. Because, of course, what the United States – what the court was deciding in that case was how do you think about the United States party status in a declined QATAM suit like this one? And attendant to its holding, it drops this footnote. It's holding that the United States is not a party for purposes of Rule 4 in a declined QATAM suit. It issues this important caveat to say that, of course, doesn't mean that the United States needs to intervene before it can vindicate on appeal its rights. And it gives a couple examples. It says if the suit is dismissed over the United States objections, that's the United States reserve rights at 3730B1. It points to the United States' ability to intervene. That's under 3730C3, and it makes clear that these are just examples. And so I don't think that this court would actually be going out on much of a limb to simply point to this statement in Eisenstein and then, of course, point to the usual collateral order doctrines. Again, I return to where I started. This is not an instance where, as in the Will v. Halleck case, which, of course, predates Eisenstein, the United States wants to just ñ it's a defendant. It wants to wrap up these charges. When the United States is forced to allow a suit like this to go forward, an effort to enforce federal law, that type of intrusion on the executive branch, historic and usually unreviewable prerogative to decide how to enforce federal law and the attendant public harms that an ill-advised enforcement suit can cause, that can't be remediated at the end of the day. We're not worried about the ultimate judgment here or flipping liability. We're not liable for anything. We're the plaintiff. And there is no other context in which the United States can be forced to suffer the continuance of an enforcement action. Indeed, in the criminal context, this court has issued writs of mandamus when district courts have decided, contrary to the executive branch's determinations, that certain charges or certain conduct really does need to be prosecuted. And the district court tried to appoint a special prosecutor and say, no, I think these charges, there's really something to them. And that's a species of what the district court did here. Of course, Congress created the ability for relators to, in a sense, stand in the shoes of the United States and bring these suits. But Congress also reserved the United States the ability to dismiss those actions. Ms. Patterson, are the government's motions to dismiss always filed in open proceedings or are they sometimes filed under seal? I ask because the government has asserted that one possible purpose of the hearing requirement is to create a public record. So is it always the case that a public record is created? I don't know the answer as a historical matter as to whether we have ever filed a dismissal motion before the seal period expired. The cases I'm familiar with, we don't file all that many motions to dismiss, have been after when there is a public docket. But, of course, even if we were to file before the seal period ended, there still is a public record. It's just that it would be for a time under seal. And, of course, the court would still be presiding over the hearing that is required. You know, the United States has to give notice to the relator of its intent to dismiss under C2A. And the court needs to afford a hearing. And the D.C. Circuit has explained that the purpose of this is to give the relator a formal process to interact with the government. I want to note, we engaged in a very robust course of discussion with the Relators Council here. But, of course, there's nothing in the statute that requires us to do that. And so the hearing could be a sort of statutory backdrop if the relator felt we were not engaging enough, we had not listened to their reasons for wanting to continue the suit. As the D.C. Circuit said, the hearing could well serve that purpose. And just focusing on the text of the statute. Can I ask you a question on that point? Of course. The one thing that seems odd to me about a hearing for those purposes alone, the limited purposes that you just articulated, is it's odd for Congress, is it not, to require a hearing, but then to prohibit the content of that hearing from informing the exercise of judicial review. I'm going to push back on the basic premise that it would be that extraordinary. There are a number of statutes where Congress, without prejudicing the government's ability to sort of make a decision at the end of the day, sets out processes, the government hoops the government has to jump through, and those hoops are judicially enforceable. The example that comes to mind is NEPA. Yeah, fair enough. But in this situation, what the hearing as a practical matter amounts to is the court serving as a convening authority. Because if the Attorney General of the United States files a motion to dismiss, and that, just by virtue of it being filed, and swift applies, as you would have it, the hearing is not serving any purpose with respect to the exercise of judicial review because the motion must be granted. And so it's basically the court is just a public convening forum. Again, with reserving my previous answer that I actually don't think that's that extraordinary, there's a second purpose, and this is, I think, where the D.C. Circuit's reservation of the possibility that if some extraordinary circumstance came to light, the hearing would be the place where it could be surfaced. And sort of looking to exercises of prosecutorial discretion, of course, courts presume that the government exercises it. So how does a hearing work in the swift world? So what I mean by that is if swift is right, it seems to me that the Attorney General in the hearing would just say, on balance, as Chief Law Enforcement Officer, I've determined that this case should be dismissed, and I'm under no obligation to say any more. I think that is a possible way a hearing could unfold. Just as a matter of actual practice in the world, of course, D.D.C. holds these hearings under the swift standard. Sure. At the hearing and in our motion, typically the government outlines its basic rationale for thinking that the case should not go forward. But I think you're right that on the purest – Do you do that just as kind of a prudential matter of professional courtesy or out of a sense of legal obligation? I think the former, Your Honor. I think as a matter of pure legal obligation, as is the case in the criminal prosecution context, we're under no obligation to justify our decision to not go forward in a case. And it's only if the other side is saying, hey, there's something wrong, if they can make a clear showing that we have, for example, contravened constitutional limits in how we are making these decisions, at that point the court might be within its rights to sort of follow up on that. That's very standard in the criminal world, and we think that it should carry over to the civil enforcement context, too. And I do want to focus – I know we've been talking a lot about the hearing, and that comes from the text of the statute. And I want to make sure that we go through some features of the statute here, which is that there are a number of rights reserved to the United States and attendant to almost all of them, but notably not C2A. The statute itself talks about the standard the court is supposed to use, talks about the, quote, showing the government has to make. So in C2B, it's the same lead-up if the United States wants to settle a case notwithstanding the relator's objection. That's what happens in C2A. There's supposed to be a hearing, and at that hearing in C2B, Congress said, all right, the court's going to approve it if it finds the settlement is fair, reasonable, and adequate under all the circumstances. There's no language like that in C2A. Similarly, in C2C, it says there has to be a showing by the government of interference or repetition or harassment in order to restrict the relator's participation. In C3, even just to intervene in the case late, it says that we have to make a showing of good cause similar to – even just to extend the seal period, there's a standard. We have to make good cause shown. And so I think that the court needs to take seriously Congress's choices to entrench a standard for some things the United States wants to do while it remains notably silent on others. And that other, of course, accords with the United States' historically largely unreviewable discretion to just end an enforcement action. I'd like to go back, if I could, to the question of jurisdiction. Yes. And the question is whether we might avoid the creation of a new category of appealable collateral orders by simply treating the government's motion to dismiss in a case like this as also an implicit motion to intervene, to intervene for the purpose of dismissing. And then if that's denied, you have a well-established path to the appellate court. I'm not actually – I have a couple of thoughts about that, Your Honor. I'm not actually sure we would have any better established route if we were the plaintiff and we tried to dismiss invoking our rights under Rule 41. You'd be an intervener. You'd be seeking to intervene to exercise your rights under Rule 41. Right. And if for some reason the government denied it, I'm actually just not sure of the state of the law. I haven't been able to find a case that says that we would automatically get in or that that is a better established – Even if you don't get in, you can appeal that. But we would have to wait to the – we might have to wait to the end of the day, which, of course, is what we – No, not the denial. The footnote you're relying on in Eisenstein – sorry, yeah, Eisenstein points out that it's well-established that the denial of a motion to intervene is immediately appealable. But if we were granted intervention, Your Honor, and then tried to dismiss, I think we might well be stuck in the same boat we're in now. I think that's the scenario we're concerned about. Well, think about that possibility. Let me ask you one thing that really troubles me about the government's position in this case, which is that you are seeking dismissal with prejudice as to the claims of the relators and without prejudice to the claims that the government might have against the defendant. That, in fact, is the standard practice. Various district courts have actually explained that they didn't think they could do it any other way because, of course, this is not a case where you are litigating through the end of the case or where the United States has consented to these relators proceeding in this particular action. So we agree that we are prejudiced if we allow a relator to go through the entire process. We can't come back after the defendants. But where we are trying to call the whole thing off, the reason that we ask, and we specifically ask that it not be with prejudice to the United States, is because if we later find out that there is a different fraud – because, of course, we don't think that these allegations, as stated, had a sufficient legal or factual basis – we don't want defendants later coming in because of some temporal or, at the margin, some factual overlap and trying to say that we are barred from proceeding against newly discovered fraud because of some incidental overlap here. So this, in fact, is a – I understand your caution along those lines, but it also looks like it could be abused as a two-step to just cut the relators out of the deal. Well, two things, I think, are the backstop against that. One, I think we well might be faced with the False Claims Act alternate remedy provision. This is in 3730. It says that if the United States is allowed to seek redress for the fraud alleged by a relator through an alternate means – of course, there are often administrative means or other remedies available to the government – but at that point, the relator can seek a share of that alternate remedy. So if we tried something like Your Honor is positing, we might well be faced with an alternate remedy suit. Second, the United States has no interest in cutting out relators for the process. We recover billions of dollars, and it would be very short-sighted and certainly not consistent with our practice to try to pull a fast one to get a relator cut out of the case. Agreed, but extraordinary things are happening in the government these days. And if extraordinary things happen where we try to cut a relator out, I think they would well have the statutory mechanism of an alternate remedy to come and complain about that. I see that I am almost out of time. I'm happy to answer more questions, but I would like to have a few minutes for rebuttal if the court is – We'll see. We'll see. All right. Thank you. All right. Thank you for the relators. Let's see. Ms. Pescea. Good morning, Your Honors. Leslie Pescea on behalf of the Apelli Relator. As Your Honors noted, there are two separate issues at issue in this case. The first is the jurisdictional issue. The second deals with the standard and the application of the standard to this case. But in order to get to that second inquiry, this court has to have jurisdiction over the appeal, and it simply doesn't in this case because the United States government chose to appeal this under 28 U.S.C. 1291, the final order appeal. So they have to operate under the collateral order doctrine. The Supreme Court has been very clear in 2006 in their Will v. Hallett decision. They specifically said, I quote, we meant what we said, end quote, about expanding the collateral order doctrine, and they've been very hesitant to do so. And this is not the case that falls within the collateral order doctrine requirements. I'm going to briefly talk about Eisenstein since the government relies on that case to suggest, or it's my understanding that Eisenstein gives them a new category of cases that fall under this. Excuse me. Yes, ma'am. Excuse me. On the collateral order question, are you suggesting that if the government moves to dismiss because the case might interfere with an ongoing investigation and the court denies that motion, the government may not immediately appeal? Is that your suggestion? If I understand your question specifically, there are provisions in the False Claims Act that allow the lower court to stay discovery and to stay a False Claims Act case if the government shows it could impede their investigation of a different case. Those facts aren't what we have here. And respectfully, the Eisenstein case did not actually deal with the collateral order doctrine at all. It dealt with the issue of the statute of limitations for appeal. And the footnote also makes a difference from the case they discussed and the case we have here. They mention in their footnote a case where the dismissal order was granted and the government objected. That's not what we have here. And that sort of order is far more conclusive than the order that we have here denying a motion to dismiss, which falls in line with the collateral order doctrine's prongs, the first of which is that it must be a conclusive decision. And in this case, it simply isn't. The government does agree that in order to meet the collateral order doctrine, it has to satisfy all three prongs, not just one, not just two, but all three. The very first one is the conclusiveness of the decision. The denial of the motion to dismiss in this case is not conclusive. The same thing, though, could be said about denials of motions to dismiss or for summary judgment on grounds of a qualified immunity, correct? That is correct, Your Honor. And when qualified immunity is at stake, it's specifically noted in statutes. It's specifically noted in cases. Qualified immunity is not part of the False Claims Act issue that we're dealing with here. Qualified immunity is not a statutory defense. Correct, Your Honor. But in the false claims context, qualified immunity, Congress and courts have not discussed. No, my point was more general about how the collateral order doctrine and specifically its first prong works. And it would seem to work in this case much the way that a denial of a qualified immunity defense would work. We respectfully disagree, Your Honor, because the qualified immunity issue, the False Claims Act is different in the sense that the relator has the authority to bring these cases on behalf of the government, and the False Claims Act has specifically given the relator their own types of rights in pursuing these cases. So, for example, if the government declines to intervene, the relator can continue pursuing the suit with no qualified immunity issues, no qualified immunity suggestions. But in the qualified immunity, I think, Judge, I mean, I may be mishearing, but I think the point is broader, okay? Just step back from the False Claims Act for a second. Precisely. Okay, forget, just forget about the False Claims Act. The reason that qualified immunity is, as I understand it, allowed to be appealed as a collateral order is not because if you waited until a trial and there was an adverse decision for a law enforcement officer that she or he wouldn't be able to appeal at that point in time. It's because there's been a conclusive determination on a matter of law that can go up on appeal now and save the time and expense and resources, you know, that the law enforcement officer would otherwise have to suffer if the litigation played out. And I think the United States, as I understand their position, they're saying, look, there's pretty substantial executive branch law enforcement prerogatives at stake here. And that's why it's analogous to, you know, what's going on here. I think that's the argument. And, you know, if the government were required to wait until the end of the suit to appeal the denial of the motion to dismiss, the government would have already suffered all of the burdens of the motion of the suit and the damage to its interests. In the context of this case, I think the issue that we have here is what the government actually did and what it actually presented to the court. The denial of the motion to dismiss wasn't with prejudice. They could never bring another motion to dismiss. We can never discuss this issue again. I think that's the difference in the conclusiveness of the lower court's order here and the issue of qualified immunity. Here the government has. Hold on, hold on, hold on. One of the points that the U.S. Supreme Court has been clear about in the collateral order cases, like Mohawk, et cetera, is they have over and over again instructed, don't worry about the individual case before you. Think about the category of cases that are being sought for purposes of collateral, you know, the collateral order doctrine. So I think the way I take that instruction is that we shouldn't focus on what happened and what didn't happen here. We should think about this category of cases and whether they're properly recognized, as Judge Hamilton articulated, as a new category for purposes of, you know, the application of the doctrine. I think the distinction between this type of cases falls in the fact that the government is a party and interest on the plaintiff's side. So qualified immunity typically deals with attorney generals being sued, governments being responsible for some sort of legal recourse that they shouldn't be responsible for. That's not what we're talking about in the False Claims to Act cases. As Eisenstein specifically noted, the government isn't actually a party to this case until they intervene. They were very clear about that. And so the party and interest, they benefit from the cases ultimately if they're successful, and if there is a judgment against the relator, the relator is responsible for that judgment, responsible for those costs, and responsible for pursuing the litigation. Now, we're not immune or unaware of the fact that the government may have to have some role in the litigation. But even, I believe, Eisenstein also noted that the government often is aware of False Claims Act cases when they don't intervene, and they have a minimal role. And that goes to the second prong where the litigation burden, the Supreme Court has also said, is not a sufficient reason to have a collateral order doctrine for the case to be in the collateral order doctrine. So with respect to the – Finish your thought, and then I have a question for you. With respect to the qualified immunity, I think in the category of cases from the larger standpoint is this isn't an instance where the government is a defendant. The government has some sort of legal right that's going to be at stake if they are not allowed to appeal this at this time. I have a global question for you. Look, the government frequently decides for a variety of reasons not to prosecute cases that might be fully meritorious, including the judicious use of limited resources. If that's the case, how is it appropriate for a court, for a district court to deny the motion to dismiss for lack of a better investigation? This goes to the standard. I find it so odd. I understand, Your Honor. This goes to the Sequoia Orange standard. And the issue in this case, if you look at on page A15 of the appendix, that's the motion, the memorandum that the Department of Justice filed in this case. They spent six and a half pages discussing my client, the relator. They had exhibits that did not deal with their investigation, that did not concern their stated conclusory issues. They went to the point to provide evidence about how they disliked the relator but did not provide evidence about why they want to dismiss this case for other reasons. And that is what the court had to look at. That's what the government chose to file. That's the bill they chose to ring. And that's what the court looked at in this case was that motion, those reasons. And with respect to reconciliation. Can I ask you a question on this point? The question I have is suppose, for example, that we agree with you that Sequoia Orange is the right path to go down legally. Do you agree that the Ninth Circuit at least has said that what they intended there is for the standard of review to kind of mirror the constitutional rational basis standard? Correct. Do you agree with that? That is what they said. Okay. And if that's the case, in keeping with Judge Rovner's observation, why isn't the inquiry here limited to simply the reasons the government has offered to support its dismissal? Are they facially plausible? The Sequoia Orange standard has two separate prongs. The first of which is did the government set forth rational reasons? The second, though, is whether the relator has provided information that makes that decision seem arbitrary or capricious. Based on the government's own filing in this case and its issues with the client specifically, that's what the court looked to to show and decide that the relator was able to show that the reason for dismissal was arbitrary and capricious. So suppose in a different case, a hypothetical case, the attorney general through an AUSA or U.S. attorney made a representation that we have taken a hard look at these matters and on balance believe that our law enforcement resources are better allocated to different priorities within the Department of Justice. And that's just a judgment we've made. Is that reviewable? And if so, how? Meaning under what kind of what would the rational basis review look like in a situation like that? I think if that was the only thing the court had to look at, then if there were no evidence that the decision was arbitrary or capricious, then there's nothing that the court could base its decision to deny that motion on. It's different from the case that we had here, where, as I stated, the Department of Justice started off in their brief for six and a half pages on this personal issue with the relator. That's what they chose to write. That's how they chose to bring the case. But they chose to do a lot more than that. The government supplied several reasons for wishing to dismiss. It found little merit in the case. It did not wish to expend the resources on discovery and monitoring the suit. And as a policy matter, the government found that the nurse educator services were helpful to government health programs and patients. The fact that you are harping on that the government also didn't care for the tactics of the relator is really largely, I believe, irrelevant. Because the government has given you its reasons here. Respectfully, Your Honor, we don't think it's irrelevant because it does provide their first reason for dismissal. And the problem that the district court had in this case with the conclusory stated reasons for dismissal concerning merits and litigation costs was that they provide evidence and affidavits about the issues with the relator and then didn't provide any sort of contradicting evidence to support its reasons for dismissal. So looking at the facts and the case as a whole, it leaned toward arbitrary and capricious reasons for dismissing the case in this instance. So I'll tell you an impression I had. I expect you'll disagree with it, but hearing wise, what's valuable to me. When I read the transcript, I thought, okay, this is off on a foot of rational basis review in keeping with Sequoia Orange. And then without using these words, it seemed to drift the level of inquiry and probing and requests for showings, et cetera, into what we might think of as like a form of intermediate scrutiny. And that's what I thought. It's not in keeping with Sequoia Orange and the deference owed the executive branch that all these courts have, no matter what side of this split you pick, have underscored is important. I understand your concern, Your Honor, and we aren't advocating for some sort of the government needs to provide X amount of information. It needs to always provide a cost-benefit analysis. I think, in this case, what the court was looking for was something more than the conclusory allegation in the original memorandum. You know, under the rational basis standard in other contexts, we usually ask whether the court can imagine any rational reason for the action. In other words, we're not limited to the universe of reasons given by the parties. Why shouldn't that be the case here as well? And if it is, how can the court deny the government's motion in this case, where I, for one, can imagine any number of reasons for the government to decline? Could you repeat your question? I'm not sure I followed specifically. It's a question, to be honest with you. I'm just saying that we're not limited to the universe of reasons. You're not happy with the reasons. I am. You're not. But we're not, you know, we're not limited to that universe of reasons. I can think of a lot of reasons. I think it's important in that case to also look at the context behind the purpose of the False Claims Act, the purpose of having a relator, the purpose of giving the relator rights. If you look at a lot of Senate and House testimony, they were concerned that the government, there was fraud happening that the government didn't notice or would refuse to prosecute. And so they made it an important point that the relator has rights to continue the case in the event that the government chooses not to. And that was the biggest concern for Congress under the False Claims Act, is getting taxpayer money back in these types of cases. Could I ask you to explain a little bit about the merits of this case to me? And let me just, as I understand it, the alleged kickbacks here are in the form of support services for doctors who prescribe the drug in question. So if I go to a store and buy a computer and the price includes tech support for two years, free, no additional charge, is that a kickback under your theory? In this case, there would be no federal funds at issue. But to sort of make it synonymous, this goes beyond the allegations in this case, go beyond sort of providing patient information and providing the support services that are provided would have to be provided by doctors anyway. They would have to get preapproval for their patients. They would have to go through the process. That would happen in the doctor's offices no matter what. So it's not some sort of extra thing that these companies are providing. It's in lieu of the doctor's own staff providing these things, which has value. Sure, it has value. If I'm a small business, I can hire somebody else to do tech support for our computer system, or I can just buy it as part of the original computer system. Why is the difference between those two arrangements potentially criminal? Under the kickback statute, drug manufacturers are not permitted to provide remuneration in order to obtain prescriptions. And there's evidence in this case that they actually used this value, these support services, to promote their drug over others, which is a brand-name drug costs more for the government. That would be the same for my computer hypothetical. If you say, yeah, we're going to charge you a little more up front, but you're not going to have to pay monthly maintenance or support service fees. Right. And in the private context, that might be fine. With private insurance companies, that also might be fine. But the thing we're dealing with here is the anti-kickback statute, where Congress has said we don't want drug manufacturers providing things of value in return for prescriptions. If the education were being provided on Maui, I would understand that. But I don't understand. What I'm getting at is it's not difficult for me to understand why the government might not want to pursue this case. In this case, because the services are going to have to be provided by the doctors anyway, they're obtaining value for essentially getting extra staff in their office. That's a cost that they now don't have to pay that they would otherwise have to pay because the drug company has provided them that value. Is it clear to you, though, and I guess maybe this is a question for Ms. Patterson, is it clear to you that the government agrees in line with what Judge Hamilton's asking, that both of these forms of remuneration are kickbacks within the meaning of the statute? In our opinion, it is. Based on the plain language of the statute and guidelines on remuneration. The question was about the government's view. No, no. I mean, is this a given in litigation? Everybody has taken it. Everybody.  Your Honor, I see my time is about to expire. Do you want to answer the question? Please. I thought that was disputed in no small part because of there's a reference in the briefs to some administrative guidance, maybe from an inspector general or HHS or somebody. You'll know the answer to this. Respectfully, Your Honor, it's not so clear cut whether it is or isn't. The anti-kickback statute is broad. Remuneration is defined as a certain thing of value. What we've done is the allegations fall in line with those. To our knowledge, there is no specific government document that says they can't provide these things of value or they can provide these things of value. Thank you. All right. Thank you, counsel. Ms. Patterson, rebuttal. Picking up where we left off, the government did say in its motion to dismiss that in inspecting the allegations here, it found that the particular practices alleged were appropriate and beneficial. And this is part of why it's so troubling both that we were not allowed to dismiss this case and why we might have to, on their theory, wait to the end, is that there are always countervailing public policy concerns. The mere provision of educational services to patients taking a drug can be used as a kickback, but it can also be structured lawfully. And what you had here was Relator bringing 11 interrelated ketamine suits essentially against an entire industry in a way that the United States considers contrary to public policy. And just a quick example, part of the education is to allow patients to inject themselves with their drug, which obviously increases, is good for the patients. It increases patients' compliance, but it also saves the United States, the Medicare costs, other costs of having people have to come back for office visits every time. And the court referred to the category of cases as being relevant. I agree. The other reasons that the United States has previously used it. Is to, is to prevent the possible disclosure of classified information that might take place as a case unfolds. It's to promote peace within an industry, which was one of the reasons the ninth circuit found appropriate in Sequoia and Orange. And here the United States has made a determination that it is not in the interest of the public that this whole industry be dragged through years of litigation based on practices that the United States has determined don't set out an articulable violation of the anti-kickback statute. I see I'm out of time. If there are no further questions. Judge Rovner, did you have a question earlier? No, thank you. Thank you, Your Honor. All right. Thanks to all counsel. The case will be taken under advisement.